**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RAMNARAIN JAIGOBIND, MICHELLE | ) | |
| JAIGOBIND, and QUIET SHORES LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:22-cv-01099-JCH |
| | ) | |
| RONALD CARAPEZZI, NEWELL CARAPEZZI, | ) | |
| CONNERS DEVELOPMENT, LLC, MATT | ) | |
| CONNERS, DAVID PREUSCH ARCHITECT, | ) | |
| JOSEPH A. LATTARULO,  MARY GREEN, | ) | |
| WILLIAM RAVEIS REAL ESTATE, and | ) | |
| CHAMPION ENGINEERING DESIGN AND | ) | |
| CONSTRUCTION, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR RULE TO SHOW CAUSE AND SANCTIONS**
**AGAINST RONALD CARAPEZZI AND NEWELL CARAPEZZI**

NOW COME, Plaintiffs, RAMNARAIN JAIGOBIND, MICHELLE JAIGOBIND and QUIET SHORES, LLC ("Plaintiffs") and pursuant to Federal Rule of Civil Procedure 37 and L.R. 37(a) and (b) and all other applicable Rules and hereby file this Motion for Rule to Show Cause and Sanctions against Defendants' Ronald Carapezzi and Newell Carapezzi (the "Carapezzis"), and in support thereof, state as follows:

**<u>INTRODUCTION</u>**

This lawsuit arises from the millions of dollars in damage and concealed defects within the high-end residence at 10 Gray Lane, Westport, CT that the Carapezzis sold to the Plaintiffs (the "Property"). The Carapezzis were aware of – and concealed – numerous costly defects, such as the water intrusion issues the Carapezzis had painted over before selling the house and denied any issues with the Property to the Plaintiffs before the sale both in person and in writing.

1

This matter has been marred by various Defendants' repeated failures to turn over basic discovery, forcing Plaintiffs to file multiple meritorious motions to compel.  This motion concerns an elementary component of discovery: communications between the Carapezzis and (i) the other parties to this lawsuit and (ii) other third-party contractors related to the Property.  While communications with parties or third parties regarding the Property and the work performed are responsive to numerous request and interrogatories, they are mostly plainly related to three requests previously addressed by this Court: Requests to Produce h, q, and r.  The Carapezzis' repeated and willful failure to turn over such basic discovery merits strict sanctions.

### ***Request for Production h.***

Plaintiffs have repeatedly asked the Carapezzis to produce communications regarding the Property, most notably in Request h.  In response the Carapezzis agreed to produce text messages and emails ("will produce emails and text messages").

> **h. All documents which refer or relate to communications between any of the parties to this action (including any party who had been a party but who no longer is a party) regarding the subject Property;**
>
> **RESPONSE: Defendants object to this production request as it is overbroad, unduly burdensome and outside the scope of discovery as it is not limited in subject. Notwithstanding the objection, the defendants are searching through and will produce emails and text messages concerning the home construction, water damage, and the purchase and sale of the home. (Exhibit 4)**

To date, the Carapezzis' response to Requests h remains unchanged.  The Carapezzis have produced a total of 5 pages of text messages between Ronald Carapezzi and Matt Conners, and

238 pages of emails between Ronald Carapezzi and Conners, or other various contractors.[1] As detailed below, their productions have been wholly insufficient.

**<u>Request for Production q and r</u>**

The Carapezzis present identical objections to two (2) areas of discovery:  documents regarding the 22 contractors who worked at the property, and documents related to the construction/repair/maintenance at the property.  Specifically:

> **q. All documents which relate or refer to each contractor which performed work on the Property;**
>
> **RESPONSE: Defendants object to this production request as it is overbroad, unduly burdensome and outside the scope of discovery. It is not limited in scope or time. Notwithstanding the objection, the defendants will provide such documentation related to contractors who provided relevant work and that is within their possession or control.**
>
> **r. All documents which relate or refer to any construction, repairs or maintenance including but not limited to progress reports, meeting minutes, policies and procedures, manuals, daily logs, contracts, plans, specifications, memoranda, correspondence, work orders and purchase orders;**
>
> **RESPONSE: Defendants object to this production request as it is overbroad, unduly burdensome and outside the scope of discovery. It is not limited in scope or time. Notwithstanding the objection, the defendants will provide such documentation related to contractors who provided relevant work and that is within their possession or control. (Exhibit 4)**

In recent months, the Carapezzis have produced a selection of invoices, quotes, receipts, etc. regarding the work performed on the Property.  As discovery has progressed, Plaintiffs have learned that much of the work performed at the Property was paid in cash.  Moreover, the Carapezzis have produced minimal documentation regarding any proof of payment for any of the

---

[1] Many of these emails involved non-party subcontractors who did work completely unrelated to the alleged damages in this case, such as the tv/audio wiring, landscape, or installation of appliances.

hundreds of thousands of dollars for work performed at the Property prior to its sale to the Plaintiffs. As discussed below, Mr. Carapezzi testified at his deposition that he kept meticulous accounting records and he could also obtain additional bank records and proofs of payment, but he was never asked to do so by his attorneys. Accordingly, Plaintiffs remain without payment records for the vast majority of the work done during the Carapezzis' ownership of the Property. This includes payments made to the Conners Defendants and the numerous other contractors hired to do the build-out of the basement, or work on the numerous areas of the Property that are at issue in this case, such as the roof and rear balconies.

### History and Timeline

While the Carapezzi' emails and text messages with the other parties are obviously relevant, discoverable, and responsive to Plaintiffs' discovery requests, the Carapezzis' desultory discovery efforts have forced extensive briefing [Dkt. 124, 156, 184, 196], a September 20, 2023 hearing before Judge Hall [Dkt. 128, 130], the January 17, 2024 hearing before Judge Vatti [Dkt. 219], and now this current motion. Moreover, Plaintiffs efforts to obtain these communications started with their initial discovery request to the Carapezzis on **May 5, 2023** – over a year ago.

The Plaintiffs issued initial written discovery to Defendants Ronald Carapezzi and Newell Carapezzi (Interrogatories and Requests for Production) on May 5, 2023. The Carapezzis provided their initial responses on June 15, 2023. Those responses were substantially incomplete, failed to provide basic and quite meaningful information, and over and over asserted groundless, meritless, and improper objections.

On July 5, 2023, and again on July 14, 2013, the Plaintiffs held Rule 37 meet and confer conferences with counsel for the Carapezzis in a good faith attempt to resolve the issues raised

herein.  During those conversations, issues regarding time frame, scope and clarification of certain requests/responses were discussed.

During the conference Counsel for the Carapezzis acknowledged there were 100+ responsive text messages with the general contractor Conners (co-Defendant) that had yet to be produced but would be.   Counsel also indicated that a significant number of responsive emails were on Ronald Carapezzi's work email and would be produced.   Plaintiffs' counsel then offered to subpoena the employer but was told that was not necessary and those emails would be provided.

Following these initial Rule 37 meet and confers, counsel for the Carapezzis agreed to supplement their discovery responses. The Plaintiffs followed up by telephone on the aforementioned dates and by email on or about July 7, 2023.   Over 45 days after their last Rule 37 conference, Plaintiffs filed their first Motion to Compel against the Carapezzis on September 14, 2023, [Dkt. 124] which was presented to Judge Hall at a hearing on September 20, 2023.

During that September 20, 2023, hearing, the Court and the Carapezzis' counsel had the following exchanges:

| | |
|---|---|
| [COURT:] | … They have represented that they requested a meet and confer on June 21 and you were unavailable until the 27. You agreed to supplement your discovery responses as of September 19. Plaintiffs' counsel represents you haven't done that. I mean is that a misrepresentation to the Court? |
| AUXIER: | We're working on two technical issues regarding downloading text messages which are not as easy as emails as everyone knows and Mr. Carapezzi unfortunately used a business email during this time, and he is no longer affiliated with that business. So we are trying to get the emails that he does not possess from that third party. That's where we are...  (Exhibit 1, 17:14 – 18:1) |
| COURT: | Sir, technical issues I appreciate. I constantly have to ask my 30-something son for help with computer or IT-related issues. Let alone the IT department at the courthouse, so I'm very sympathetic with that claim. However, you knew that back in late June. It is now three months. It can't take three months. If you don't know how to do it or someone in your office, an associate or paralegal who has an expertise with these kind of issues in discovery, then you are going |

|          |                                                                                  |
|----------|----------------------------------------------------------------------------------|
|          | to have to go out and get somebody. Otherwise we'll just sit here from now to the end of time. Right? |
| AUXIER:  | We have escalated it to a third party IT company and asked them the best way to get it done. |
| COURT:   | When did you do that, sir? When did you first contact this company? |
| AUXIER:  | We contacted the company a couple of weeks ago… My client FOIA got back with us about three weeks ago, so we were trying to expedite this to get these emails to plaintiff as quickly [as] possible. |
| COURT:   | That's over two months from when you agreed with the plaintiffs apparently to supplement your discovery responses which would include I assume these text messages. That's not acceptable. I guess the second aspect of this you said Mr. Carapezzi is no longer affiliated. You don't have the business email on the company server? |
| AUXIER:  | We don't have access to it. |
| COURT:   | Why not? |
| AUXIER:  | He doesn't work there. |
| COURT:   | It is a business email. It is your email address. |
| AUXIER:  | No. |
| COURT:   | If an employee dies, there's somebody in IT who has the ability to override and get into an email account. I can't believe that doesn't happen in a company. |
| AUXIER:  | They do but they have to go through and find the emails that are related to his personal residence as opposed to the tens of thousands of emails that were related to his [business] pursuits. |
| COURT:   | That's a challenge that lawyers have faced for the last 25 years in searching emails, agreeing on terms and finding the ones that are most likely relevant to the discovery sought, but you don't accomplish that by sitting on your hands for three months. It is not acceptable. |
| AUXIER:  | I agree the progress is unacceptable, but we have been working on it. It's not being ignored. (*Id.*, 18:11 – 20:12) |

After hearing this argument, this Court made it very clear that the defendants would not be permitted to frustrate the discovery process any further without consequence:

|          |                                                                                  |
|----------|----------------------------------------------------------------------------------|
| COURT:   | This discovery [in] these two categories and whatever else you promised plaintiffs' counsel is going to be due in three weeks. If you don't produce it, then I will consider under the rules sanctions which could include precluding you from introducing certain evidence at trial. I recommend that you get that IT expert and you get working and this is your priority and your client's priority. All right? |
| AUXIER:  | Yes. [Dkt. 130 at 20:13 – 20:21.] |

Judge Hall ordered the Carapezzis' "discovery regarding emails is due to plaintiffs in three weeks" and Plaintiffs were to "submit a supplemental filing as to both pending Motions to Compel to report whether production was complied with." [Dkt. 128] The Carapezzis persisted in refusing or failing to produce the e-mails and text messages. As a result, the plaintiffs renewed their motion to compel in a Supplemental Status Report filed on October 26, 2023 [Dkt. 156], which was fully briefed [Dkt. 184, 196] before being heard on January 17, 2024. (Exhibit 1, Transcript of January 17, 2024 hearing).

At the end of the hearing, Judge Vatti told counsel that he would enter and continue the motion to compel, that plaintiffs' counsel had seven hours to take Mr. Carapezzi's deposition, and that, if there was in fact a failure to comply discovery obligations set forth in Judge Hall's prior orders, then a motion should be brought. (*See* Exhibit 1, 65:10 – 66:8)

Ronald Carapezzi was thereafter deposed on February 27, 2024. During his testimony, Mr. Carapezzi contradicted his counsel's prior representations to the Court regarding his compliance with discovery and this Court's prior orders. In sum, Mr. Carapezzi testified that he never review the interrogatories or requests to produce in searching for responsive text messages and emails, as he "left that up to [his] counsel." (Exhibit 2, 17:25-18:13) Nor did he ever search for any text messages regarding anyone other than Defendant, Matt Conners. (*Id.*, 19:3 – 20:21, 56:25 – 58:9) Furthermore, he never had difficulties in contacting his former employer to access his emails. (*Id.*, 48:24 – 50:7) Mr. Carapezzi confirmed ongoing and willful violations of this Court's orders.

## LEGAL STANDARD

Federal Rule of Civil Procedure 37 governs failure to make disclosures and cooperate in discovery. Rule 37(a) governs motions to compel, and establishes a rebuttable presumption that a court should grant expense shifting sanctions to the prevailing party on a motion to compel. *Fed Rules Civ Proc R 37(a)(5); 7 MOORE'S FEDERAL PRACTICE - CIVIL § 37.23.*

Under Rule 37(b)(2), the court is authorized to award sanctions for failure to comply with a discovery order, including by:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

"Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *Fed Rules Civ Proc R 37(b).*

In determining what sanctions to award, the Second Circuit looks to factors "including (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Robertson v. Dowbenko*, 443 F. App'x 659, 660 (2d Cir. 2011). Repeated failure to respond to interrogatories and document requests, in violation of court order(s), can constitute willful and deliberate noncompliance and justify entry of default judgment against a litigant. *See Dowbenko,* 443 F. App'x at 661.

## ARGUMENT

Plaintiffs bring this Motion for Rule to Show Cause following Ronald Carapezzis' deposition, in which he testified under oath that he never looked for text messages or emails with any of the other parties, nor was he asked to do so by his counsel.   (See Exhibit 2, 19:3 – 20:21, 56:25 – 58:9)  Moreover, to date, the Carapezzis have not produced a single email or text message from Newell Carapezzi, although numerous communications with Newell Carapezzi have been received from other parties in their discovery responses. Likewise, there have been nearly no payment documents, such as receipts, cancelled checks, bank statements, etc., for any of the work done for the Carapezzis during their ownership of the Property. Finally, there have been numerous misrepresentations made by the Carapezzis to this Court regarding their efforts to obtain these communications, associated delays, and the completeness of their prior productions.

### *Misrepresentations regarding Text Messages (Request h)*

Mr. Carapezzi retained William Raveis and Associates (and its agent, Mary Green), to buy and sell multiple homes in Connecticut, including the purchase of 10 Gray Lane in Westport, Connecticut; he also had numerous communications with her colleague, Michelle Genovesi.  Mr. Carapezzi had also hired and communicated with dozens of contractors who were paid hundreds of thousands of dollars to build out the lower level of the house, as well as to repair damage to the property caused by leaks.  However, despite the involvement of these numerous individuals, Mr. Carapezzi unequivocally testified that he was never asked to, nor did he ever, search for text messages for any of them; rather, the only text messages he searched for and produced were with Mr. Conners.

Specifically, Mr. Carapezzi startlingly admitted that he had only found 13 text messages when he went through his phone to produce screenshots (Exhibit 2, 10:9 – 10:12), that he did

not recall if he had been asked to even look for his text messages by the time his attorneys appeared before Judge Hall in September 2023 (*id.*, 13:13 – 14:24), and that all that he did was look at the phone he possessed and take screenshots, which he produced to his attorneys – specifically testifying that he "took pictures of each text message, and [he] forwarded those pictures to [his] counsel." (*Id.*, 16:21 – 17:3)

It is clear that this information was readily available, could have been produced, and should have been produced at the time of the initial disclosures in March 2023, at the time when plaintiffs' discovery requests were made in June 2023, at the time of the Fed.R.Civ.P. 37 conferences in July 2023, when the parties were before Judge Hall in September 2023, and when the parties were before Judge Vatti in January 2024, or prior to his deposition on February 27, 2024.

Mr. Carapezzi also testified that that he never reviewed the document requests made of him, and that was "left… up to my counsel" – meaning that he therefore did not know what he was required to produce.  (Exhibit 2, 18:3 – 18:13)

Mr. Carapezzi then made the following explicit admissions:

| | |
|---|---|
| Q | [To] the best of your knowledge, have you produced all relevant text messages that relate to this case? |
| A | All relevant text messages – |
| Q | That relate to this case? |
| A | From who? |
| Q | Good point. Text messages, text messages that you sent to Conners or he sent to you, do you believe you've produced all of those to the best of your knowledge? |
| A | Yes. |
| … | |
| Q | Did you look for text messages in your phone between you and Mary Green? |
| A | No. |
| Q | Did you look for text messages between you and the architect, Mr. Preusch? |
| A | I don't even know who he is other than I've heard the name before. |

| Q | So the answer would be no? If you didn't know who he was, you didn't look for them; right? |
|---|---|
| A | No. |
| Q | Did you look for text messages between you and Mr. Stefan (*sic*) Rogers or anybody from SSR? |
| A | Again, I don't know who that is… |
| Q | Rogers was – he purported to be an owner of SSR, developer, owner. …. So as it stands here today to the best of your knowledge, when you went through your phone, the only text messages you looked for were between you and Conners. Would that be correct? |
| A | Yes. (<u>Exhibit 2</u>, 19:3 – 20:21) |

Mr. Carapezzi then then again admitted that he did not look for nor did he produce any text messages for anyone involved in the case other than this text messages with Mr. Connors:

| [Q] | Now, if we could, sir, in the text messages that you produced, there's not a single text message between you and your wife, and I'm representing as an officer of the court in 13 to 22 there's not a single text message to you or your wife. Did you look through your phone to produce text messages between you and your wife as issues relating to this lawsuit? |
|---|---|
| A | No. |
| Q | Were you ever asked to do that? |
| A | No. |
| [Q] | ….Did you look for text messages when you looked through your phone for you and Michelle Genovesi? |
| A | No. |
| Q | And did you look for any text messages from any of those individuals to you?... |
| A | I don't specifically recall, but I don't think so. (<u>Exhibit 2</u>, 56:25 – 58:9) |

Mr. Carapezzi did not search for – nor was he told to search for – any text messages with the other parties in this lawsuit regarding the home, including real estate brokers and over a dozen contractors that he personally retained to build out the house.  All of these people have knowledge about the work done at the house during the Carapezzis' ownership.  At minimum, these contractors are key witnesses and very well may be proper defendants in this case.

***Misrepresentations regarding Third-Party Vendors (Request h):***

Mr. Carapezzi's testimony further shows that their counsel's representations that there was a delay in production because of an alleged inability to pull text messages off his phone was

11

false. He testified that he was the one who took the initial screenshots of the text messages which were produced following the hearing before Judge Hall, and did not rely upon a third party IT expert.  During the deposition, a portion of the transcript of the September 2023 hearing before Judge Hall was read, leading to the following exchange:

> [Q]    My question is do you personally recall reaching out to a third party vendor to help you with the texts because you couldn't do it yourself?
> A    I think I already answered that, that I didn't reach out to anybody…
> Q    Okay. So there was a third party IT company?
> A    But I didn't reach out to them.
> Q    Who did?
> A    I believe my counsel.  (Exhibit 2, 55:15 – 56:24)

Mr. Carapezzi created the screenshots of text messages that he produced following the September 20, 2023 hearing.  The properly formatted and complete text message exchange between Conners and Carapezzi was produced on February 26, 2024. In other words, according to counsel's representations and the "Sworn Verification of Ronald Carapezzi" dated February 5, 2024, it took the IT vendor, at minimum, from "a couple of weeks" before the September 20th hearing [Dkt. 120, 19:3-7], up until February 26, 2024, to "extract the text messages from" Mr. Carapezzi's cell phone. (Exhibit 7) The only other plausible explanation is that the IT company did not assist at all, or counsel withheld these text messages for several months while Plaintiffs filed and presented their motions to compel.

Likewise, there is no excuse for counsel's prior representations of "100+ text messages" that were too exhaustive to produce timely were compiled into a 5-page document and produced to Plaintiffs the day before Mr. Carapezzi's deposition.  (Exhibit 3)  To date, Plaintiffs do not know what exactly this vendor did to assist in accessing these text messages, and why it took so long to produce 5 pages of text messages in a readable format.

In sum, the Carapezzis' counsel informed Judge Hall on September 20, 2023, that they were already working with an IT vendor to access their clients' text messages. They were ordered to produce these texts within 3 weeks of that hearing, but merely produced screenshots of some, but not all, relevant texts, created by Ronald Carapezzi, personally. They then delayed for an additional 4+ months, before producing a properly formatted document contained all (purportedly) of Mr. Carapezzis' text messages with Mr. Conners (and only Mr. Conners) the date before Mr. Carapezzi's deposition. Mr. Carapezzi then testified that he did not conduct any search whatsoever for any text messages with anyone other than Mr. Conners regarding the Property. In other words, despite repeated court orders, the Carapezzis *still* have not complied with their obligation to produce text messages with (i) other defendants and (ii) third-party contractors concerning the Property.

The Carapezzis have refused to abide by basic discovery obligations and this Court's orders concerning text messages, causing massive delays and costs to be incurred by Plaintiff.

***Misrepresentations regarding E-Mails (Requests h)***

As for Mr. Carapezzi's e-mails, contrary to counsel's representations to Judge Hall in September 2023, Mr. Carapezzi's own testimony shows that there was no genuine difficulty in getting these emails from Mr. Carapezzi's former employer. At the September 2023 hearing, counsel for the Carapezzis made the following representations:

| | |
|---|---|
| Auxier: | We're working on two technical issues regarding downloading tex messages which are not as easy as emails as everyone knows and Mr. Carapezzi unfortunately used a business email during this time, and he is no longer affiliated with that business. So we are trying to get the emails that he does not possess from that third party. That's where we are… |
| Court: | Sir, technical issues I appreciate. …However, you knew that back in late June. It is now three months. It can't take three month. If you don't know how to do it or someone in your office, an associate or paralegal who has an expertise with these kind of issues in discovery, then you are going to |

|          | have to go out and get somebody.  Otherwise we'll just sit here from now to the end of time. Right? |
| -------- | --- |
| Auxier:  | We have escalated it to a third party IT company and ask them the best way to get it done. |
| Court:   | When did you do that, sir?  When did you first contact this company? |
| Auxier:  | We contacted the company a couple of weeks ago. … My client FOIA got back with us about three weeks ago, so we were trying to expedite this to get these emails to plaintiff as quickly as possible. |
| Court:   | That's over two months from when you agreed with the plaintiffs apparently to supplement your discovery responses which would include, I assume these text messages.  That's not acceptable.  I guess the second aspect of this you said Mr. Carapezzi is no longer affiliated.  You don't have the business email on the company service. |
| Auxier:  | We don't have access to it. |
| Court:   | Why not? |
| Auxier:  | He doesn't work there. |
| Court:   | It is a business email.  It is your email address. |
| Auxier:  | No |
| Court:   | If an employee dies, there's someone in IT who has the ability to override and get into an email account.  I can't believe that doesn't happen in a company. |
| Auxier:  | They do but they have to go through and find the emails that are related to his personal residence as opposed to the tens of thousands of emails that were related to his business pursuits. |
| Court:   | That's a challenge that lawyers have faced for the last 25 years in searching emails, agreeing on terms and finding the ones that are most likely relevant to the discovery sough, but you don't accomplish that by sitting on your hands for three months.  It is not acceptable. [<u>Dkt. 130</u>, 18:20 – 20:9.] |

Contrary to the statements made to Judge Hall, Mr. Carapezzi was the former CEO of this company and he had absolutely no such issues and it took him no more than a couple of weeks to get these emails. Mr. Carapezzi specifically testified that he was able to get the e-mails when he made a simple phone call to his former colleague, Scott, the CFO:

| Q | And who did you reach out to [to obtain your emails]? |
| - | --- |
| A | Who did I reach out to? |
| Q | Yes. I mean you had left the company at that point. Did you contact the CEO? Did you contact the general counsel? Did you – you must have called somebody up and said I need documents? |
| A | Yes. I spoke to the CFO. |
| Q | And who was that? |

| | |
|---|---|
| A | His first name Scott. I can't … I'll remember his name before we're done, but it was Scott. |
| Q | Was he cooperative when you contacted him? |
| A | Absolutely. |
| Q | Real cooperative; right? |
| A | Yes. |
| Q | And when you contacted him, he said he would do everything he could to get you the emails; right? |
| A | Yes. |
| Q | And after you contacted him, how long was it before he got the emails? A couple weeks? |
| A | I don't know because I don't think the emails came to me. [Exhibit 2, 48:24 – 50:7.] |

Mr. Carapezzi went on to testify as follows:

| | |
|---|---|
| [Q] | Was he cooperative? |
| A | Yes. |
| Q | And did he tell you he would move right to it to help you out? |
| A | I don't remember the exact words, but he was cooperative. |
| Q | Okay. And to the best of your knowledge, did he get those emails to your counsel fairly quickly after you asked him? |
| A | I don't know. |
| Q | Did you ever have to contact him after the first call and say, listen, I haven't gotten the emails; I need your help. Did you ever make such a call? |
| A | No. |
| Q | And after your first call with him when he said he would get the emails, did you ever have to take any steps to make a second call to get those emails? |
| A | To Scott? |
| Q | Yes, or anybody at your former company? |
| A | No. |
| Q | So the best of your knowledge, after you made that one and only call, at some point after that the emails were given to your counsel; correct? |
| A | Yes, at some point they were given to my counsel. I assume they were given to my counsel. |
| Q | Well, the bottom line, no one ever told you they weren't turned over in short order. Is that correct? |
| [A] | No one ever told me anything. |
| Q | …Do you have any knowledge of why there was this delay in getting emails from the company for six or seven months from the time they were – do you have any knowledge why it took so long? |
| A | I don't know that it took that long because I don't recall when I called him. |
| Q | Well, that's a good point. So it could have been within a month of you calling him? |

[A]     Again, I just don't recall when I called him. (*Id.* at 51:7 – 53:4) (Objections omitted.)

From all of this, it is absolutely clear that the fact that Mr. Carapezzi's emails were held at a former employer imposed no meaningful barrier to their production in this case.  He repeatedly testified that his former employer was "cooperative," so Judge Hall was entirely correct to infer that the emails could have been produced well before the September 2023 hearing.  Rather, counsel for the Carapezzis dragged their feet, misrepresented their efforts to the Court, and forced Plaintiffs to bring multiple unnecessary motions to compel to obtain wholly relevant emails.[2]

More troublesome still is the fact that Mr. Carapezzi admitted that, after the e-mails were turned over, he was never furnished with them, never saw them and did not check them personally:

> [Q]     When you contacted the company, did you ask them to provide all information that was requested in the interrogatories?
> A     I told them that I needed all of my emails, so I assume they did. I've never seen them.
> Q     You've never gone through them to check yourself personally?
> A     They didn't come to me.
> Q     And you never asked to see them?
> A     No. (Exhibit 2, 147:3 – 147:12)

This is even more concerning because of the separate issue Plaintiffs had in obtaining a signed Verification from the Carapezzis confirming that their production was complete and accurate to the best of their knowledge, which was not produced until February 7, 2024 – (after

---

[2] It must also be noted that the production of these emails contained several extremely important emails.  Most notably, an October 27, 2020 email from Ron Carapezzi to Matt Conners in which they discuss about ~$100,000 work of repair to "rebuild the defective balcony patios and the related ceilings" … "which were damaged due to your defective construction."  (Exhibit 5) Also, a June 24, 2021 email (5 days before the Plaintiffs closed), in which Ron Carapezzi threatened to sue Matt Conners for "a series of constant leaks and related damage" and "you acknowledged that your supplier of these materials erroneously employed an interior sealant in lieu of the appropriate exterior sealant which you indicated was the primary source of the problem." (Exhibit 6) These emails were not produced until December 2023.

16

being ordered to do so by Judge Vatti following the January 17, 2024, hearing on Plaintiffs' Motion to Compel). Moreover, Judge Vatti ordered counsel to "identify the custodian of records who searched for emails on the work computer, and shall do so by February 9, 2024. To the extent that plaintiffs desire explanation of the manner of that search, they may inquire in a deposition of the identified custodian or Ronald Carapezzi." [Dkt. 223] To date, Plaintiffs have not been provided this information other than Mr. Carapezzi's testimony regarding the former CFO, "Scott." Plaintiffs have since made several follow-up requests for Scott's contact information to no avail.

Moreover, after Plaintiffs spent months trying to obtain the emails from Mr. Carapezzi's former employer, Mr. Carapezzi testified at his deposition that he also had a personal email address:

Q      Did you have any of them stored electronically?
A      I'm sure – meaning on my email or my text?
Q      Yes.
A      I'm sure a number of these are either on email or text. What I'm not sure of, if it's – I guess I'd have to look at the date, whether it's my old email or my new email. (Exhibit 2, 145:10 – 147:12)

Mr. Carapezzi's repeated disavowals of personal knowledge regarding the email production at his deposition suggest that his Verification is unreliable, and that the Carapezzis' email production remains incomplete. Plaintiffs have not received any emails from Mr. Carapezzi's "new email," nor have they received any emails from Newell Carapezzi, even though she was copied on numerous emails.

***Failure to Turn Over Payment Information (Requests q and r)***

Mr. Carapezzi's testimony also demonstrates the existence of payment and accounting records for work on the Property that the Carapezzis have failed to turn over during discovery. His own words show that he made little-to-no effort to search for this obviously relevant

information in connection with this lawsuit.  This kind of information is important for establishing the nature and extent of the work performed on the subject Property before the sale; this demonstrates both the existence of the defects at issue in this lawsuit and the Defendants' knowing concealment of those defects from the Plaintiffs.

Notably, Mr. Carapezzi testified as follows:

Q   Okay. Now, if you look like, for example, for Robin Kramer design, it says 737,104.18. How did you go about calculating that number?
A   The total amount for Kramer?
Q   Yes.
A   Based on her invoices.
Q   Did you keep a spreadsheet or something? I mean you have 10 or 12 subcontractors.
A   I want to say I have all the backup detail. However, we had a hurricane in Florida September of 2022, pretty prominent hurricane called Ian, and I did have a lot of files that were damaged.
Q   Did you have any of these – had you done a search before September of '22 for these documents?
A   Yes. I only would have created these numbers based on documents under the premise that I would have to show them to the IRS if I was audited.
Q   Did you have any of them stored electronically?
A   I'm sure – meaning on my email or my text?
Q   Yes.
A   I'm sure a number of these are either on email or text. What I'm not sure of, if it's – I guess I'd have to look at the date, whether it's my old email or my new email.[3]
Q   Have you searched your old email for any information?
A   I don't have access to my old email.
Q   It's through the – the old email is –
A   Through the company.
Q   But when you contacted the company, did you ask them to provide all information that was requested in the interrogatories?
A   I told them that I needed all of my emails, so I assume they did. I've never seen them.
Q   You've never gone through them to check yourself personally?
A   They didn't come to me.
Q   And you never asked to see them?
A   No.

---

[3] Plaintiffs have not received any emails from Mr. Carapezzis' "new email", nor was there any explanation why communications from his "new email" were not produced timely.

Q      Okay. So the bottom line is it would be your belief that the backup to the
       amounts which appear on Exhibit 33 would be contained in emails and
       text messages that if they exist, they would be with your employer?

A      They could be. Otherwise there's certainly backup with my banks and
       credit card companies.

Q      Okay.

A      I assume credit card companies also file this stuff.

Q      Did you reach out to your credit card companies to get the information
       that was called for in the interrogatories?

A      No.

Q      And you have the ability to --

A      Well, excuse me. I'm not sure what was called for in the interrogatories.

Q      But let me put it this way. You've never contacted your credit card
       companies for any information connected with this lawsuit; correct?

A      No.

Q      And you've never contacted your banks for any information called
       for in this lawsuit; correct?

A      No.

Q      Okay. And therefore, would it be your belief between the credit card
       companies, the banks, and your employer that you should be able to get
       much of the backup for the amounts that appear on this page?

A      Yeah, I mean I -- to the extent that they keep, they still have it in file, yes.
       (Exhibit 2, 145:10 – 147:12)

It is therefore clear that Mr. Carapezzi has critical information, including bank statements

and credit cards which he used to pay off vendors.   This is wholly pertinent to the facts of this

case, and the involvement of parties and non-parties alike.  Instead, Mr. Carapezzi did not know

he was asked to produce the payment records, which were quite clearly called for in the

interrogatories and document requests.  Mr. Carapezzi has not complied with Judge Hall's order,

as well as his discovery obligations generally.  Based on the limited discovery plaintiffs have

obtained from third parties, the records that Mr. Carapezzi possessed would have established who

the payments were made to, when the payments were made, and what was the nature and scope of

all the property damage caused by leaks which Mr. Carapezzi was aware of prior to closing.

The Plaintiffs have now had to file two motions to compel and take Mr. Carapezzi's

deposition, only to discover that Mr. Carapezzi had failed to disclose critical information which

he was obligated to disclose by rule and by Court order.  The damage cannot be undone, but Plaintiffs should not be required to bear the burden for the Carapezzi Defendants willful and continuous violation of this Court's orders.

## **CONCLUSION**

On September 20, 2023, Judge Hall gave the Defendants three weeks to comply with her order to produce e-mails and text messages. Mr. Carapezzi's testimony demonstrates that he did not comply with Judge Hall's order specifically and his discovery obligations in general. On January 17, 2024, after hearing argument that the Defendant had produced all the text messages and e-mails in his possession, Judge Vatti advised Plaintiffs' counsel to have Mr. Carapezzi deposed, and then come back and to renew the motion to compel if Mr. Carapezzi's testimony justified renewing the motion.

This case is nearly two years old and fact discovery is scheduled to close in a month. Communications with other parties is an elementary discovery request.  The work done on the Property prior to the sale is of central relevance to the lawsuit.  Plaintiffs have been fighting to obtain discovery of this evidence for over a year. The Carapezzis' refusal to abide by basic discovery obligations has forced the Plaintiffs to proceed with discovery, and major depositions, without the benefit of texts and e-mails that Mr. Carapezzi could have, and should have, produced a year ago.  Mr. Carapezzi's own testimony shows that the asserted cause of the delay—records in the hands of a third party—was a red herring, because that third party was entirely cooperative.  Other information was demonstrably at Mr. Carapezzi's very fingertips, on his own phone, and yet was produced untimely and with obvious gaps.  There is no excuse for such conduct.

Plaintiffs have incurred substantial costs in fully briefing and presenting multiple motions to compel between September of 2023 and the present, in addition to the numerous Rule 37 meet and confers and attempts to resolve these discovery disputes. The instant record demonstrates willful and repeated noncompliance with discovery obligations, which is grounds to enter penalties up to and including entry of default judgment. *See* FRCP 37; *Dowbenko,* 443 F. App'x at 661.

## PRAYER FOR RELIEF

For these foregoing reasons, Plaintiffs respectfully request that this Court enter an order pursuant to Rule 37(a) immediately awarding Plaintiffs their costs and fees incurred in bringing this motion and all previous motions to compel against the Carapezzis, and for all further relief the Court deems just and equitable.

Plaintiffs further request that the Court enter a Rule to Show Cause against the Carapezzis as to why the Court should not enter a further order pursuant to Rule 37(b) (i) finding the Carapezzis in civil contempt of court, (ii) awarding further monetary sanctions against the Carapezzis and in favor of the Plaintiffs, (iii) directing that the Carapezzi's intentional concealment of known material defects shall be taken as established for the purpose of this lawsuit, (iv) striking the Carapezzi's affirmative defenses, (v) granting the Plaintiffs default judgment against the Carapezzis, and (vi) for any further relief the court deems just and equitable.

Dated:  May 16, 2024

Respectfully submitted,

/s/ Edward F. Ruberry

William B. Wynne (ct00401)
Adler Law Group, LLC
111 Founders Plaza, Suite 1102
East Hartford, CT 06108
Tel: (860) 282-8686; Fax: (860) 282-8688
Email: wwynne@adlerlawgroupllc.com
    -and-
Edward F. Ruberry, Esq. (pro hac vice)
Rostyslaw J. Smyk, Esq. (pro hac vice)

21

Edward D. Mizera, Esq.  (pro hac vice)
Ruberry Stalmack & Garvey
300 S. Wacker Drive, Ste 3250
Chicago, IL 60606
Phone: 312-466-8050; Fax: 312-466-8055
Email: ed.ruberry@ruberry-law.com
       ross.smyk@ruberry-law.com
       edward.mizera@ruberry-law.com

## **CERTIFICATION**

I hereby certify that on May 16, 2024, a copy of the foregoing Plaintiff's Motion for Rule to Show Cause was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.


*/s/ Edward F. Ruberry*
Edward F. Ruberry